## 32962. HARDEN *v.* THE STATE.

DECIDED MAY 23, 1950.

*Bruce D. Dubberly, J. T. Grice,* for plaintiff in error.

MacIntyre, P. J. 1. In special ground 2 of the amended motion for a new trial the defendant contends that the court erroneously admitted in evidence the following testimony of the witness Dow Padgett: "I hardly believe I would know Mr. Harden, the defendant in this case. I have seen him one time in my life before, and that was about three weeks ago. I seen him around the place there. As to what section of the county it was, it was down there at what we call the Oscar Weitman place. As to what he was doing, he was feeding a hog. He made a statement to me about the hog. He said C. N. Boone asked him to shut up his hogs. I saw him there about to get the hog. He made a statement as to whose hog it was. I told him that wasn't Mr. Boone's hog, it was my boy's hog and he said he, well he wouldn't bother it. That was about two or three weeks ago. He did not do anything to bother him except to feed him, that is all. He was shelling some corn to the hog. He told me he thought it was Mr. Boone's hog and I told him it was my son's hog and he said he wouldn't bother it. As to whether he had done anything other than shell a little corn out to her, there was a little more than that now, there was a pig, she had three pigs and there was one just off a little piece and he seemed to be interested in the other pig and he said there was four of the pigs. He said he thought they were Mr. Boone's hogs, Lum Boone's hogs, Mr. Boone has a lot of hogs down there. Mr. Harden lives down there and as to whether or not he was feeding his neighbor, Mr. Boone's hog, that's what he thought he was doing. And I told him he was mistaken and I told him it was my son's hog; he didn't take the hog that I know of. As to what he told me about getting the hog from Mr. Boone, I told about all he said about the hog, he stated that he thought it was Mr. Boone's hog and he was going to shut him up and let him know about it. He said he thought that was his neighbor Boone's hog and he was going to shut him up and let him know about it." The objection of the defendant to the admission of this evidence was: "We object to the testimony because he is not charged with stealing hogs, and in a conversation with Mr. Padgett some three or four weeks prior to the

alleged commission of this alleged crime is wholly immaterial and illustrates nothing in the world in this case." It appears from the record that Boone, the gentleman referred to in the evidence objected to, testified: "I slightly know Mr. Ansel Harden; I've seen him a half dozen times I guess. I own some hogs down in the community where I live. I have never instructed Ansel Harden to shut up any of my hogs down there. I have never had any conversation with him about catching up any of my hogs." This is a case of simple larceny and one in which the guilt of the defendant depends upon the intent with which the act was done. In the words of Justice Storey the principle of the admissibility of collateral facts is stated thus: "In all cases where the guilt of the party depends upon the intent, purpose or design with which an act is done, or upon his guilty knowledge, I understand it to be a general rule that collateral facts may be examined into in which he bore a part, for the purpose of establishing a guilty intent. In short, whenever the intent or guilty knowledge of a party is a material ingredient in the issue of a case, these collateral facts, that is, other acts and declarations of a similar character tending to establish such intent or knowledge, are proper evidence." Bottomley v. United States, 1 Story's Rep. 135, cited with approval in *Farmer* v. *State*, 100 *Ga.* 41, 44 (28 S. E. 26). In the instant case it must be shown that the defendant's intent was to steal the cows in question. Such intent is not a presumption of law, but a matter of fact for the jury. Being a secret operation of the mind, it can only be ascertained by acts and representations of the defendant; a single act or representation in many cases would not be decisive, especially where the accused has sustained a previous good character. But when it is shown that he made similar representations or had done similar acts about the same time to other persons and by means of such acts or representations he had obtained livestock of another, it would tend to establish his intent to steal the cows as alleged in the indictment. We think that the evidence was admissible as tending to illustrate the intent of the accused in his actings in the transaction for which he was then on trial. *Farmer* v. *State,* supra. This is especially true in view of the testimony of Mr. Boone that he had never instructed the defendant at any time to pen his hogs.

The relevancy of these "other transactions" does not arise from the fact that they were criminal but from the fact of their having happened. *Lee* v. *State,* 8 *Ga. App.* 413, 418 (69 S. E. 310); *Scott* v. *State,* 46 *Ga. App.* 213 (167 S. E. 210); *Martin* v. *State,* 10 *Ga. App.* 795 (74 S. E. 304); *Goldberg* v. *State,* 20 *Ga. App.* 162 (92 S. E. 957). This ground of the motion for a new trial is without merit.

2. In special ground 3 the defendant contends that the court charged the jury incorrectly in giving the following portion of the charge: "Gentlemen of the jury, along with other contentions in this case, the State contends that the defendant committed other similar offenses, that is offenses similar to the one covered by this indictment, along about the same time of the alleged commission of the offense named in the indictment. Now, you gentlemen will recall that when that evidence was admitted I instructed you that I would later give you a proper limitation on that evidence and I will now do so, and that evidence was admitted, gentlemen of the jury, subject to that limitation. The defendant is on trial for the particular offense charged against him in the bill of indictment and not on account of any other alleged offense or offenses. Where, however, knowledge, motive, intent, good or bad faith, and other matters dependent upon a person's state of mind or conduct, scheme or plan is involved as a material element in a particular criminal offense for which a defendant is on trial, evidence of the defendant's conduct, with reference to a similar transaction about the same time is admissible for the consideration of the jury, insofar only as they may intend [tend?] to illustrate the state of the defendant's mind on the subject involved or to show conduct, scheme or plan. Any evidence with reference to other alleged transactions of the defendant must be limited by the jury to the consideration of the state of the defendant's mind with reference to the subject involved in this case, and for no other purpose. Now, gentlemen of the jury, I charge you in that connection that that evidence was not admitted as evidence to place the character of the defendant in issue on this trial. It was admitted solely for the purpose just stated to you, gentlemen of the jury, if you find that there was no evidence admitted in this case tending to show any other offenses, or that

they failed to show any other offense, why then you would disregard this section of the charge altogether." The error assigned upon this charge is that it was wholly unauthorized by the evidence and extremely prejudicial as conveying to the minds of the jurors that regardless of what they thought of what the defendant intended in feeding a neighbor's hog, that. the court thought he was trying to steal the hog, and in this way the jury was influenced to adopt the court's opinion or belief as its own. We think that the evidence in this case authorized the jury to find that in attempting to take possession of a hog, which he said he thought was Mr. Boone's, by attempting to take the hog from the open range and shut him up in his own pen, which attempted action he said was upon the instructions of Mr. Boone, that the defendant intended to steal the hog, as Mr. Boone testified that he had on no occasion so instructed the defendant. And the jury was authorized to find that the "Boone" transaction was of a similar character to the one for which the defendant was being tried and happened about the same time on the same range as the offense charged in the indictment. It follows that the charge was authorized by the evidence, and the court having confined this evidence to its legitimate purpose, there is no error in the charge for any reason assigned. This ground of the motion for a new trial is without merit.

3. Special ground 1 is but an amplification of, and will be considered here in connection with, the general grounds of the motion for a new trial. Under the general grounds the defendant contends that there is no corroborating evidence or circumstances of the testimony of the codefendant Algerine Waters which either directly or indirectly connects the defendant with the crime charged in the indictment. The crime is alleged in the indictment to have occurred October 8, 1949. Algerine Waters testified: "I saw Mr. Harden on Saturday morning about the 8th of October, this year. I saw him the first time that day over at my father-in-law's home. My father-in-law lives about a mile from where Remer Waters lives. Mr. Ansel Harden lived on what we call the Black Ankle section on the river down in that section. He went to my house early the next morning; approximately seven or eight o'clock. He told me my daddy said he wanted me to help him drive some cows out. He told

me where to go. He told me he wanted to take me to the house to get the mules. He told me how to drive them and what to do with them. He told me to come through by the Munison Bridge and on by New Smyrner Church. I would have went the other way if I hadn't been directed to go that way by Mr. Harden. I went the other way when I was riding the mules. The shortest way to go drive the cows back is the way I went down there on the mule. The distance I went was about three or four miles. The distance [of the way] Mr. Harden directed me to come by Smyrner Grove is about five or six miles, something over two miles difference. The easier way to drive the cows was the straight road. As to why I would say that, it was about three quarters of the way in a fence and I could have kept the cows in that fence. He didn't tell me what right they had with the cows, he just told me to help my father drive them. When I got back to the house with the cows Ansel and my daddy was at my father's house. We drove the cows in the lot at the house when I got back. Mr. Ansel Harden and my father drove the cows in the lot. After we got the cows in the lot, I heard a conversation between my father and Mr. Harden. I heard Ansel tell my daddy if the cows hadn't been claimed by the following Wednesday he was going to bring his de-horners back and dehorn the heifer and take her to his place; that's his place down on the river. That was on Saturday morning Mr. Harden and my father went to the mill and I think, on Friday in Mr. Harden's truck. That was on the day before this, he was over there talking to my father. Mr. Harden does not do any work around my father's place. I see him very often around there with my father. Sometime I see them hauling cattle back and to. I see him pretty frequently around my father's." On cross-examination the same witness testified: "I live some distance away from my father. I live at my father-in-law's house. My father-in-law is Willie Thompson. Mr. Harden should know where I was that day, I stay there he should know. He has never been there to see me but he has passed there and I was there all the time. I have been living there ever since June. Mr. Harden comes around my father's house occasionally; riding in his little truck. Once and a while he has some high sides on it. The sides are on it about as much as they are off, about

half the time the truck has high sides and I haven't seen a hind gate. When I got that message that day he told me that my daddy said to go and drive up some cows. He told me approximately where my daddy said to go; he told me my daddy said to go on this side of Henry Durrence's house, about three quarters of a mile. This side of Henry Durrence's coming from toward Midway. I don't know how far Henry Durrence lives from the Camp Stewart area. I don't know where Ray Durrence lives. . . I found my daddy back toward Midway from Henry Durrence's house, just off the road. The cows were near the road; my daddy was standing up there with the cows. That is about the same spot I got the message to go to. It was about eight thirty or nine o'clock in the morning when I got down there. I know my daddy's cows. As to whether or not there was some cows in that bunch that belonged to my daddy, there was one in that bunch and the others, I don't know whose they were. I took the whole bunch and drove them with the mule to my daddy's place. Harden give me the instructions to carry all the cows. As to what my daddy said about it, he said to go ahead and take them. Harden told me my daddy said to go down there and drive some cows and Harden told me the way to take them. I had never driven any cows by the direction of my father before that time. I am twenty-one years old. As to whether or not I had driven a cow in my life before that day, I have driven them all my life. I have driven them by direction of my daddy. Mr. Harden didn't tell me, before that day, how to drive a cow. I do not usually take directions from A. E. Harden what to do or my father or somebody else. I have never taken directions from A. E. Harden of what to do in my work. The day I left my home and got a mule, I did that because my daddy sent word for me to do it but Harden did tell me what road to take. Harden told me how many cows was in the bunch; he told me to bring back seven cows. He said my father said for me to go down there and help him drive some cows. He didn't tell me that my father said the best way to drive them back was this road we are talking about, he didn't tell me that. I went way around because Harden told me to. Harden ain't bossed me in nothing. As to why I went two or three miles out of the way simply because Harden said so, well

I just did. If he had told me to drive them around by Reidsville, I wouldn't have done it. As to why I went two or three miles out of the way because Harden said so, I was just doing it for him. I have driven cows two or three miles out of the way for somebody else besides my daddy. I did it for different people. I ain't drove no cows for nobody else but I drove people around out of my way. I drove the cows some two or three miles out of the way and I didn't have a reason in the world for doing that except Harden said to do that, that's right." K. D. Smith, an investigator for the State, testified: "I had an occasion to investigate this case while the defendant was in jail. I heard a conversation between Harden and Waters but I couldn't hear it very well, I was confined in the jail. I could hear Harden good but I couldn't hear Waters. As to whether I heard them say anything about this case in court about the cows, Harden said I didn't tell them a damn thing, did you tell them anything, and I couldn't hear exactly what Mr. Waters said. When Waters first got in jail, Harden said, I didn't tell them a damn thing, did you tell them anything and I couldn't make out what Mr. Waters said back to him, he was further back in the jail. I later talked with him about the case coming from the jail and he said he went over to Remer's house, said he left then and went and got Remer's son to take a mule to drive them on in and I asked him if he stayed down there, he said no, he said he got off and got drunk and the next morning he went over to Remer's house and realized he had some cattle that didn't belong to him and said after he went on home and slept the drunkenness over and got sober, the next morning he should have went back down there and made him turn those cows out. This conversation took place night before last." On cross-examination the same witness testified: "Harden's explanation was that they went down there to hunt Remer's cattle and he left Remer and told Remer's boy to go down there and I don't know who drove them out, he said he took Remer down there to hunt Remer's cattle and later he sent the boy." Owen Brannen testified for the State: "I know Mr. Ansel Harden, the defendant in this case. I know Remer Waters. I saw Mr. Waters first. He was traveling in his car. I later saw Mr. Harden the defendant. He wasn't traveling, he was at the filling station. He was on the

inside of the station when I saw him, I never did see him driving a truck. I saw Mr. Harden's truck at the filling station. I saw something in the truck. I saw a cow in the truck. I wouldn't know whether the cow was loose or tied, she had a rope on her. I have seen Mr. Harden driving the pickup truck. As to whether or not the truck I have seen him driving resembles the truck Mr. Waters was sitting in, I wouldn't say, because I didn't notice the truck enough for that. I went over to talk to Mr. Waters; I think that was the same truck I had seen Mr. Harden driving sometimes. It was a blue looking truck. I wouldn't be sure but I think it is the same truck that Mr. Harden drives." On being recalled to the stand, K. D. Smith testified: ". . . As to whether or not I talked to Mr. Harden about why he was down there and why he knew about these cows, he said he went over there to carry some corn to a mill. That was on Friday before this Saturday. Said he got over to the mill and the water was too low to grind the corn and he carried it to Claxton, had it ground in Claxton and they left there. He was talking about Remer Waters and Harden, and they came back down through the area and located Remer's cows and Remer hired him the next morning to carry him back down there. He told me he was in there on Friday evening before this Saturday morning when they got the cows and him and Remer drove through the air base and made the arrangements for him to go back the next morning and get them. He did not say anything to me about Remer writing him a letter and him getting it the next day and he went back down there. He said he was there when the cows were penned and he was about drunk, drinking wine. And he said the next morning when he sobered up, he started to go back down there and tell Remer to turn those cows out, I was not present when he talked to Mr. Hendry down at his home. Mr. Hendry wasn't present when he was telling me about being down there. We worked separate in this case." On cross-examination the same witness testified: "As to whether or not he told me how come he went up there to get some corn. I don't remember whether he said he got a message from Waters that he could get the corn or why he went that particular day. I don't remember whether or not he said he carried his corn sheller. He said he went up there and got his corn and carried

it to the water mill and the water was too low and then he went to Claxton and couldn't get it ground and they came back through the area and Remer Waters hired him to carry him, Remer back in the same territory the next morning. He said when the cows were brought in he had been drinking wine all the afternoon and he was about drunk and woke up the next morning and realized what he had done and decided he better go tell Remer to turn the cows out but he didn't go over there." The defendant made the following statement to the jury: "Gentlemen, I will tell you, as far as the way they drove the cows I don't know anything about it. I got word that the boy had located his cows and wanted me to take him to get his cow and I did take him to get his cow and the number of cows I couldn't tell you to save my life, after he penned the cows I have never been back since, didn't know anything about it. The next thing I knew they lodged me in jail on Thursday evening. I never could find out where they had a warrant for me or what, but as far as knowing the cows, whose cows, what the cows looks like, I don't know that, except one cow that was in the bunch which I did know belonged to him, the cow that I had sold him previously to that when I lived down there near him. I know that cow belonged to him, it was in his mark, I know the cow myself, because I raised her and sold her to him, and as far as knowing how, I carried him down there though, and he drove the cows out. I didn't haul the cows, didn't steal a cow, and didn't have any sides bodies on my truck and didn't have anything to do with it, didn't even go back as far as that is concerned, to see them, but he drove the cows out and the next thing I knew, the G. B. I. was down there asking me questions. I didn't take any of the cows, didn't take any part in it, didn't help drive them or nothing about it. I didn't know whose cows they were, didn't even know who had me prosecuted until yesterday. That's about all I know. He, waters, told me to come tell his boy to go over to his house, the boy was at his wife's daddy's and to get his mule and meet him and get the cows and for me to come back and pick him up. Later on, I went to town at the time while this boy went and got his daddy's mule, I went to town and about an hour or an hour and a half I went back down there on the road and picked Remer up but I didn't see the boy or the cows

and I didn't know how he went, don't even know to yet, don't even know the section he went through. I couldn't have told him cause I don't even know the section, never been in there in my life, I have been around there, I suppose, maybe on a side road, but the way he went I wouldn't know to save my life. I don't know the places that were named down there that was talked about, I never been down there, but I did take the message to the boy and he went and got the mule and brought the cows in and later on I went and picked Remer up because he said it was so far for him to walk and drive the cows, that he would be give out and I went and picked him up and carried him home."

From the other evidence in the case, it appears that the cows, which were alleged in the indictment to have been stolen, were found in the possession of Remer Waters. Algerine Waters, son of Remer Waters and codefendant of Remer Waters and Harden, testified as to the time, place and circumstances under which the cows were taken from the open range and penned at his father's house. He testified that Harden had brought him a message from his father to come to a designated point in the county to help drive the cows; that Harden had instructed him to drive the cows to his father's house by a longer and more circuitous route than he would have followed except for Harden's instructions. The defendant in his statement to the jury stated that he had been with the elder Waters when he drove the cows up out of the open range; that he had recognized only one of the cows as that of Waters; that he had taken the message to the younger Waters to come and assist his father in driving the cows home, but that he had in no way participated in the driving of the cows nor did he give any instructions as to the route to be followed in driving the cows. K. D. Smith, an investigator for the State, testified that Harden had told him that on the day the cows were penned (Saturday) he had got drunk and did not realize until the next morning that he had some cattle and that did not belong to him and that he should have gone and made Remer Waters turn them out, but he did not. The evidence shows that the cattle the defendant referred to in his statement to the investigator Smith were those that the defendant Remer Waters had seen on the open range on

Friday as they drove through that area and were the ones which they arranged to go back and get the next morning. It is also shown that they were the same cows that Remer's son, Algerine, drove several miles from the open range to Remer's house on Saturday and were the cows which were penned at Remer's house by the defendant, Remer, and Algerine, the accomplice who testified in this case. This evidence and these circumstances when viewed together as a whole were sufficient to authorize the jury to infer that the defendant participated in the theft of the cows and was guilty of cow stealing as charged in the indictment. The court did not err in overruling the motion for a new trial for any reason assigned.

*Judgment affirmed. Gardner and Townsend, JJ., concur.*